# UNITED STATES DISTRICT COURT

**FILED**

for the

WESTERN _____ DISTRICT OF _____ OKLAHOMA

AUG 0 9 2010

ROBERT D. DENNIS, CLERK
U.S. DIST. COURT, WESTERN DIST. OF OKLA.
BY_____DEPUTY

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No: M-10- 215 -P |
| Francisco Javier Reyes | ) |
| | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### COUNT 1

On or about the date(s) of April 14, 2010, in the Western District of Oklahoma, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 924(a)(1)(A) and 2(a) | Knowingly caused to be made a false statement and representation to Outdoor America, a person licensed under the provisions of Chapter 44 of Title 18, United States Code, with respect to information required by the provisions of Chapter 44 of Title 18, United States Code, to be kept in the records of Outdoor America, in that defendant caused a false purchaser's name to be used in the purchase of these firearms. |

### COUNT 2

On or about the date(s) of April 27, 2010, in the Western District of Oklahoma, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 922(a)(6) and 2(a), and 924(a)(2) | In connection with the acquisition of firearms, five Century AK-47s, from Outdoor America, a licensed dealer of firearms within the meaning of Chapter 44 of Title 18, United States Code, knowingly caused to be made a false and fictitious written statement to Outdoor America, as to a fact, material to the lawfulness of such sale of said firearms under Chapter 44 of Title 18, United States Code, in that defendant caused to be represented the name of the purchaser, which was not the name of the defendant, the true purchaser of the firearms. |

## COUNT 3

On or about the date(s) of June 8, 2010, in the Western District of Oklahoma, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(a)(5) and 924(a)(1)(D) | Defendant, not being a licensed importer, manufacturer, dealer, and collector of firearms, within the meaning of Chapter 44, Title 18, United States Code, did willfully transfer, sell, trade, give, transport, and deliver, a firearm, that is, a Barrett, .50 caliber semi-automatic rifle bearing serial number 20140, and a Century, Model WASR-10, semi-automatic rifle, 7.62 x 39 bearing serial number 1965MN0772, to an unknown individual, said person believed not to be a licensed importer, manufacturer, dealer, and collector of firearms within the meaning of Chapter 44, Title 18, United States Code, and knowing and with reasonable cause to believe that said person was not then residing in the State of Oklahoma, the state defendant was residing in at the time of the aforesaid transfer, sale, trade, give, transport and delivery of the firearm. |

This criminal complaint is based on these facts:

See attached Affidavit of Special Agent Michael D. Randall, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), which is incorporated and made a part hereof by reference.

X  Continued on the attached sheet.

_____
*Complainant's signature*

Michael D. Randall
Special Agent
ATF

Sworn to before me and signed in my presence.

Date:  8/9/10

_____
*Judge's signature*

City and State:  Oklahoma City, Oklahoma

Gary M. Purcell, U.S . Magistrate Judge
*Printed name and title*

**WESTERN DISTRICT OF OKLAHOMA**
**OKLAHOMA CITY, OKLAHOMA**

STATE OF OKLAHOMA     )
                            )
COUNTY OF OKLAHOMA    )

## A F F I D A V I T

I, MICHAEL D. RANDALL, being duly sworn, do hereby state as follows:

I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since June 2001. I am currently assigned to the Oklahoma City Field Office. As a result of my training and experience, I am familiar with the Federal firearms laws and regulations pertaining to the record-keeping requirements of individuals and/or corporations licensed as Federal Firearms Licensees by ATF. Based upon my experience as an ATF Special Agent, I know that Federal Firearms Licensees who purchase, receive, resell or dispose of firearms are required to maintain up-to-date Acquisition and Disposition Records as well as corresponding ATF Forms 4473 (Firearms Transaction Records). I am also familiar with the Federal firearms laws pertaining to the manufacturing and registration of National Firearms Act (NFA) firearms in the ATF National Firearms Registration and Transfer Record (NFRTR).

As a Special Agent with ATF, I have received instruction in both general and specific courses in the recognition and identification of firearms and their

1

place of manufacture. This training includes study at the Criminal Investigator

School (CIS) and ATF New Professional Training (NPT) at the Federal Law

Enforcement Training Center (FLETC) in Glynco, Georgia. I have personally

examined numerous types of firearms and ammunition throughout my career with

ATF.

As a Special Agent with ATF, I have access to the firearm licensing

information concerning U.S. manufacturers, importers and dealers in firearms,

including those which are licensed to do business in the State of Texas. I also have

access to the firearms records which are required to be maintained under Federal

law by those who are licensed by ATF.

The Federal Gun Control Act of 1968, as amended, requires all firearms

manufactured in or imported into the United States to bear the following markings:

name of importer (if any), name of manufacturer, place of manufacturer, caliber,

and a unique serial number. Most firearms markings after 1968 will also indicate a

model designation.

In connection with my official duties, I investigate criminal violations of the

Federal firearms laws and Controlled Substances Act. In connection with my

duties and responsibilities as a federal law enforcement officer, I have been

involved in numerous investigations of persons who are prohibited from lawfully

possessing firearms and ammunition as well as individuals who derive substantial

income from the importation, manufacture, distribution and sale of illegal

2

controlled substances. I have had extensive experience in the execution of firearms and narcotics search warrants, and debriefing of defendants, informants, witnesses, and other persons who have personal knowledge of the amassing, spending, converting, transporting, distribution, laundering, and concealing of proceeds of controlled substances trafficking. I have participated in investigations that involved the tracing of proceeds from illegal firearms and drugs in the United States and other countries.

**FURTHER YOUR AFFIANT STATES AS FOLLOWS**:

This affidavit is submitted in support of a criminal complaint and arrest warrant for Francisco Javier REYES, xx/xx/1981 and social security number xxx-xx-6958 for violation of Title 18 U.S.C. Sections 922(a)(5), 922(a)(6) and 2(b), and 924(a)(1)(A), and 2(b). I am aware of the information contained in this affidavit through direct participation in this investigation and information provided to me by other law enforcement officers. Since this Affidavit is being submitted for the limited purpose of securing a criminal complaint and arrest warrant, I have not included each and every fact know to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a criminal complaint and arrest warrant.

On May 1, 2010, your Affiant and ATF Special Agent (SA) Ray Parker interviewed Jorge Alexis BLANCO, dob: xx/xx/1985, at 311 S West, Apartment #8, Stillwater, Oklahoma. BLANCO told the agents he purchased firearms for his

3

best friend, Frank REYES, whom he met while attending Oklahoma State University. BLANCO stated he has known REYES for approximately six years and that he and REYES were going to open up a "Hookah Bar" in Stillwater, Oklahoma. BLANCO also stated that REYES lives on the sixth floor of an apartment complex named "something Towers" located near the Alfred P. Murrah Federal Building. BLANCO told the agents the apartment complex was directly west of the post office.

BLANCO told the agents approximately four weeks ago, REYES contacted him and told BLANCO that he should come to Oklahoma City to help him with something. BLANCO stated that he did not know why but he assumed it had something to do with the "Hookah Bar." BLANCO told the agents that he is a fifty percent owner in the "Hookah Bar," and he has been applying for the needed licenses to include a Low Point Beer license. BLANCO stated that when he arrived at REYES' apartment, he met with REYES downstairs. REYES asked BLANCO if he wanted to make some extra money, and BLANCO said yes. BLANCO told the agents that he is just a poor college kid, and he would donate plasma to acquire money. BLANCO also stated that REYES would give him twenty dollars on occasion to help him out.

BLANCO told the agents REYES told him he needed some guns. BLANCO told the agents  REYES gave him a wad of money to purchase the

4

firearms, as well as directions to the place to purchase them. BLANCO stated REYES told him to go to Outdoor America and purchase five AK's.

BLANCO then stated that after he purchased the firearms, he went back to REYES' apartment and then he and REYES transferred the firearms from his vehicle to REYES' vehicle. BLANCO described REYES' vehicle as a blue Chevrolet Tahoe. BLANCO then told the agents that REYES gave him approximately fifty dollars for each firearm he purchased which resulted in a payment of two hundred and fifty dollars. BLANCO stated he then drove back to his apartment in Stillwater, Oklahoma.

BLANCO told the agents approximately two weeks after the first purchase, REYES contacted him again and wanted BLANCO to purchase more firearms. BLANCO stated the second transaction took place much like the first transaction. BLANCO stated he met REYES at his apartment. REYES gave him the money and told BLANCO he wanted him to purchase five more AK's from Outdoor America. BLANCO stated that he went and purchased the firearms as before and returned to REYES' apartment and turned over the firearms to REYES. BLANCO told the agents that he was again paid fifty dollars for each firearm.

BLANCO stated that he was again contacted by REYES around noon on April 28, 2010, and REYES wanted him to purchase more firearms. BLANCO stated that he again met REYES downstairs at his apartment. REYES gave him the money, provided directions to Big Boy's Gun and Ammo, and told BLANCO

5

to purchase five SKS rifles. BLANCO stated he went to Big Boy's Gun and Ammo and purchased five SKS rifles. BLANCO told the agents he returned to REYE'S apartment, and he and REYES placed the firearms in REYES' blue Chevrolet Tahoe. BLANCO stated that he was again paid fifty dollars for each firearm.

BLANCO told the agents he was again contacted by REYES on the morning of April 30, 2010, and REYES wanted BLANCO to purchase three more SKS rifles from Big Boys Gun and Ammo. REYES stated he drove to Oklahoma City for the fourth time to purchase firearms. BLANCO told the agents the transactions happened exactly like the other three. BLANCO met REYES at his apartment, got the money, and was told by REYES to purchase three more SKS rifles form Big Boys Guns and Ammo. BLANCO stated he went to Big Boys Guns and Ammo picked out what he was told to purchase but was told by a Big Boys Gun and Ammo employee that his transaction had been "delayed." BLANCO also stated his girlfriend was with him and at first she produced her driver's license to purchase the firearms. BLANCO stated the store employee told them he needed to purchase the firearms since he picked them out, then BLANCO produced his driver's license to complete the transaction. BLANCO then told the agents that after he was "delayed" he drove back to REYES' apartment and gave

him his money back.  BLANCO stated he asked REYES why he was "delayed" and REYES stated, "Don't worry about it, it has happened to me".[1]

BLANCO told the agents that he has purchased approximately fifteen firearms for REYES totaling approximately six to seven thousand dollars and that REYES has paid him approximately seven hundred and fifty dollars for purchasing the firearms.  BLANCO told the agents that he believed REYES liked to collect firearms and on numerous occasions, REYES told BLANCO it's not illegal to purchase firearms.  Your Affiant then asked BLANCO why REYES would not just buy the firearms himself and BLANCO stated, "I don't know."

On May 2, 2010, your Affiant and SA Parker made contact with BLANCO at his apartment and asked if they could come inside to talk with him.  BLANCO invited the agents inside.  Your Affiant told BLANCO the agents just wanted to stop by and check on him and make sure he was doing OK since their talk with him the previous day.  BLANCO then stated he needed to tell the agents something.  BLANCO told the agents he lied to them yesterday, and that Frank REYES had nothing to do with the firearm purchases by BLANCO.  BLANCO stated he purchased the firearms with his money and he gave the firearms to friends as "gifts".

---

[1]A records check of federal firearms dealers by ATF agents revealed that BLANCO purchased five Century AK-47 rifles from Outdoor America on April 14, 2010, five Century AK-47 rifles from Outdoor America on April 27, 2010, five Chinese SKS rifles from Big Boys Gun and Ammo on April 28, 2010, and attempted to purchase three SKS rifles from Big Boys Gun and Ammo on April 30, 2010.

Your Affiant then asked BLANCO how his story changed overnight? BLANCO stated that he panicked yesterday when the agents talked with him and that he was now telling the truth. Your Affiant asked BLANCO if he was a poor college kid, how did he have the money to purchase six to seven thousand dollars worth of firearms? BLANCO stated he had money left over from financial aid for school, and he used that money to purchase the firearms.

The agents then asked BLANCO who were his friends that he purchased firearms for, and BLANCO would not disclose the names of his friends. Your Affiant then asked BLANCO why he could not give the agents at least one name to verify he gave a firearm to a friend as a "gift." BLANCO stated, "Why, I've done nothing wrong." Your Affiant asked BLANCO why he would spend that much money on firearms for friends and BLANCO stated "why not?"

SA Parker then attempted to obtain consent to search BLANCO'S apartment to verify the firearms were not at his apartment. BLANCO consented to a search underneath the couch and in the refrigerator. BLANCO refused to sign the consent to search form and would not let the agents search underneath his bed or in the closet. BLANCO told the agents he had a final exam tomorrow, and he needed to get back to studying. At this point, the agents concluded the interview and left the residence.

SA Holland learned that ATF Dallas recovered twenty-eight assault rifles that were on the way to Laredo, Texas from Dallas. The driver of the truck stated

8

that he had made two previous trips from Dallas to Laredo. Eleven of the twenty-eight firearms recovered were traced back to Oklahoma. One of the firearms was traced back to a FFL by the name of Martin Andrew SHARP who owns MAS Gunworks. An additional firearm traced back to Gary Matthew STINNETT, who purchased the gun from MAS Gunworks. STINNETT has been working for SHARP at several gun shows in the Oklahoma City area. Telephone toll information revealed that REYES and STINNETT contacted each other approximately one hundred and eighty three times between April 1 and May 3, 2010.

On June 3, 2010, SA Holland interviewed Damen BURRIS. One of the twenty-eight firearms recovered on April 10, 2010, traced back to BURRIS. The firearm traced back to BURRIS was identified as a Romarm/Cugir, model WASH-10 7.62 caliber rifle bearing serial number ACL-1411-88. BURRIS told SA Holland he sold the listed firearm to Chad CARTWRIGHT, the brother of someone with whom BURRIS works.

SA Holland then interviewed CARTWRIGHT and he stated that on April 1, 2010, he sold the listed firearm to an individual he identified as Frank. BURRIS described Frank as a Hispanic male with reddish colored hair and freckles. CARTWRIGHT was introduced to Frank by a mutual friend, Doug JETT. CARTWRIGHT stated that when he sold Frank the rifle, Frank asked him if he had any more rifles for sale. Frank told CARTWRIGHT he would buy as

9

many as he could get. CARTWRIGHT told Frank that he did not have any more

guns to sell. SA Holland then interviewed Doug JETT. JETT stated that he knew

REYES by a mutual friend by the name of Josh BUFFORD. BUFFORD is an

Absentee Shawnee Tribal Police Officer. JETT stated that he also sold REYES an

AK-47 rifle around April 1, 2010. REYES asked JETT if he had any more for

sale, and JETT told REYES he did not have any more guns for sale.

On June 3, 2010, SA Holland interviewed Josh BUFFORD. BUFFORD

stated that he is an Absentee Shawnee Tribal Police Officer. BUFFORD stated

he knows Frank, who was later identified as Frank REYES. BUFFORD stated

that sometime around early March 2010, he sold Frank an AR-15 rifle. BUFFORD

stated that REYES asked if he had any more guns for sale. BUFFORD also stated

that a friend of his named Luke Scarberry sold Frank an AR-15 sometime in late

March or early April 2010.

BUFFORD stated that he has talked to REYES on numerous occasions over

the last several months, and REYES is always looking for assault rifles and

even 50 caliber rifles. REYES has told BUFFORD he would like to buy at

least six AK-47's at one time. BUFFORD told REYES he has a friend who

has his FFL and he has a 50 caliber semi-automatic rifle. BUFFORD told

REYES he would sell the rifle for about $10,000.00, and that he would have to fill

out the paperwork to buy it. REYES told BUFFORD he would let him know if he

gets the money.

On June 4, 2010, REYES contacted BUFFORD and told him he had the money to buy the 50 caliber. BUFFORD asked REYES if he had the $10,000.00 to buy the .50 caliber rifle. REYES stated he had a lot more the $10,000.00, and he would like to buy some AK-47's also. REYES told BUFFORD he was looking to buy the guns in the next couple days.

On June 3, 2010, SA Parker and SA Hector Tarango went to Big Boy's Guns and Ammo located at 7211 S. Council Road, Oklahoma City, Oklahoma 73169 telephone number 405-745-7179. The special agents met with store owner, Mr. Mike Blackwell, upon arrival and requested information concerning Jorge Blanco, Francisco Javier Reyes and Mayra Melendez. The special agents asked Mr. Blackwell if he had any paperwork on purchases made by Jorge Blanco on April 28, 2010, or any other dates. Mr. Blackwell provided the special agents with two separate ATF Forms 4473 one which was dated April 28, 2010, listing a purchase of five firearms. The five firearms are as follows; all were Chinese SKS 7.62 X 39 caliber semi-automatic rifles with the following serial numbers: 10053012, 22012992, 21059602, 14858RT and 10223578. Mr. Blackwell had also attached a photocopy of Blanco's Oklahoma Drivers License and Purchase agreement to the 4473 dated April 28, 2010.

Mr. Blackwell also provided an ATF Form 4473 for April 30, 2010, where Jorge Blanco attempted to purchase more firearms but was advised by Mr.

11

Blackwell that he was delayed.   The ATF Form 4473 dated April 30, 2010, did not have any firearms listed on it but had been signed by Jorge Blanco.

Mr. Blackwell was asked how did Jorge Blanco pay for the firearms on April 28, 2010, and he explained with a "wad of 100's." Mr. Blackwell was asked if he could provide a sales receipt for the transaction, which he then provided to the special agents.   Mr. Blackwell was asked if he had a video tape of the transactions on April 28 and April 30, 2010.   He explained he did previously, but his equipment did not save transactions very long.   Mr. Blackwell offered that during the conversation with Jorge Blanco, he asked Blanco if he was a student at Oklahoma State University, and Blanco, stated he was not.   Mr. Blackwell explained during the purchase of the five SKS rifles by Jorge Blanco, Mr. Blanco explained that he was purchasing the firearms for his family members.   Mr. Blackwell also stated that on April 27, 2010, someone had called him asking if he had any SKS rifles and if so how many.   Mr. Blackwell stated he told the caller he did in fact have approximately 8 and the caller asked if Mr. Blackwell would give a better price per firearm if he were to purchase more than one.   Mr. Blackwell also stated that the caller on April 27, 2010, sounded like Jorge Blanco. However, the conversation on the 27th was not discussed with Blanco on the 28th.   Mr. Blackwell was also asked to provide any information he had on Mayra Melendez and Francisco Javier Reyes.   Mr. Blackwell utilizing his desktop computer looked up the names and found nothing in his records for the two.

12

On June 8, 2010, your Affiant and SA Holland arranged through Josh BUFFORD and Federal Firearms Licensee (FFL) Chad Polk to monitor and conduct surveillance of the purchase of a Barrett, .50 caliber semi-automatic rifle bearing serial number 20140 and a Century, Model WASR-10, semi-automatic rifle 7.62 x 39, bearing serial number 1965MN0772. This transaction was to take place between FFL Polk and REYES. Prior to the purchase, electronic surveillance methods were implemented. At approximately 6:30pm, surveillance team members observed REYES exit his apartment building and retrieve a metal ticket book from his work vehicle prior to departing in his Chevrolet Tahoe. REYES made the purchase of the two rifles for $11,000.00 in cash and included an additional two hundred dollar finder's fee he paid to Josh Bufford for locating the firearms. This transaction took place in the parking lot of the Bass Pro Shops in Oklahoma City and an ATF Form 4473 was completed for the transaction. Surveillance team members followed REYES back to his residence where the vehicle and the .50 caliber gun case remained throughout the night.

On June 9, 2010, the ATF Oklahoma City Field office conducted mobile surveillance of REYES, traveling between Oklahoma City and Woodward, Oklahoma. REYES traveled to the west side of Woodward, Oklahoma and was observed to stop and enter Butch's Gun shop located at 5005 W. Oklahoma Ave. REYES was then observed to exit the gun shop carrying the gun case that was sold with the .50 caliber semi automatic rifle in it back to his vehicle along with two

13

unidentified males. REYES and one of the unknown males were observed to lift

the case into the back of REYES' vehicle. The two unknown males then were

observed to get into a green Ford Excursion bearing Oklahoma License plate 990 -

DFW. Both vehicles then exited the parking lot and eventually split up. REYES

then stopped at a Walgreens Pharmacy drive thru in Woodward, Oklahoma and

then was observed by surveillance to drive back to the Oklahoma City area.

Your Affiant and other members of the Oklahoma City Field Office

observed REYES pass through the Oklahoma City area on I-40 eastbound and

began to travel southbound on I-35. REYES was observed to stop at exit 98

Southbound I-35 near Purcell, Oklahoma. REYES was observed sitting in an

empty parking area on the west side of I-35. Surveillance also observed a black

BMW M3 convertible bearing Texas license plate GVF-310 sitting in the same

area. After several minutes, REYES was observed to drive back onto the

Northbound I-35 ramp and continue Northbound. The electronic tracking device

indicated that the gun case was no longer in REYES vehicle. Surveillance then

caught up with the black BMW being driven by an unknown Hispanic male

driving southbound on I-35 utilizing the tracking device. The BMW was observed

to get off at an exit to Purcell, Oklahoma, then a couple minutes later, it was

observed to enter back southbound on I-35. During the Southbound surveillance, it

appeared that a tan Range Rover bearing Texas License plate BF7 S397 was

driving in tandem with the black BMW. Surveillance then observed a Lewisville

14

police officer conduct a traffic stop on the black BMW in Lewisville, Texas. The electronic tracking device continued to move and was then determined to be in the tan Range Rover. Members of surveillance continued to follow the Range Rover, which drove to a residence located at 1383 Honeysuckle Lane, Lewisville Texas. After several minutes, the black BMW was located at the same residence.

After several minutes, the electronic tracking device indicated movement of the gun case and members of the surveillance team then followed the electronic tracking device from Honeysuckle Lane to The Reserve Apartment complex located at 13907 Montfort Dr, Dallas Texas. Twenty-four hour surveillance was established at this residence to monitor the movement of the firearms.

On Monday, June 14, 2010, Special Agents David Martinez and Joseph A. Patterson, ATF Dallas Division, interviewed David Aaron Mauk at the Oklahoma Department of Corrections Office, located at 800 North First Street, Madill, Oklahoma, regarding his May 5, 2010, purchase of fifty (50) LRB Arms receivers. Mauk advised that around the middle of April 2010, he viewed an advertisement in the Shotgun News Magazine. Mauk advised LRB firearm receivers were being advertised for approximately fifty-six dollars ($56.00). Mauk advised he called the company and asked if the receivers were seconds or first quality receivers. The representative of the company advised that the receivers were first quality. Mauk advised he decided to purchase fifty (50) of the firearm receivers. Mauk placed the order and paid LRB ARMS for the purchase. Mauk believed that he paid

15

approximately three thousand dollars ($3,000.00) for the receivers. Mauk went to Pappa Dale's Pawn Shop, located at 310 West Overton, Madill, Oklahoma. Dale Wren agreed to handle the transfer of the firearm receivers from LRB Arms to Mauk.

After Mauk purchased the firearm receivers, his wife discovered that he had spent three thousand dollars ($3,000.00) and became upset. Mauk advised he asked his friend, J.B. Coppedge, who works for a licensed gunsmith, if his employer would be interested in purchasing any of the firearm receivers. Coppedge told Mauk that his employer would not be interested, however he had another friend, Matt Stinnett, who works for MAS Gunworks, located in Moore, Oklahoma, who might be interested. Mauk advised that he spoke with Stinnett and agreed to sell him forty (40) of the firearm receivers when they arrived. Mauk advised that Stinnett was going to pay one hundred dollars ($100.00) per receiver for a total of four thousand dollars ($4,000.00). Mauk advised that he was notified on May 5, 2010, the firearm receivers had arrived at Poppa Dale's Pawn Shop. Mauk called Stinnett and they agreed to meet later that day so Mauk could sell the receivers to Stinnett.

Mauk advised that he went to Poppa Dale's Pawn Shop and completed an ATF Form 4473, Firearms Transaction Record, regarding the purchase of the firearm receivers. Mauk reviewed the original ATF Form 4473 and verified that portions of the document were completed in his handwriting. Mauk also verified

16

his signature and driver's license number on the second page of the form. Mauk advised that he paid Dale Wren, owner of Poppa Dale's Pawn Shop, $100.00 for completing the transaction. Mauk advised that he departed from Madill, Oklahoma and travelled to Ada, Oklahoma, where he met with Stinnett at The Home Depot. Mauk advised that he met Stinnett near the northwest portion of the parking lot, near the portable buildings. Mauk advised that Stinnett was driving a late 1990's or early 2000's model Ford Ranger extended cab truck. Mauk further advised that there was an unidentified white male, light complexion, red hair and small build, seated in the passenger seat of the Ford Ranger.

Mauk advised that he sold Stinnett forty (40) of the LRB Arms firearms receivers. During the conversation, Stinnett talked him into selling him an additional two (2) firearm receivers. Mauk advised that Stinnett paid him $4,200.00 in United States currency for the firearms. Mauk further advised that Stinnett paid him in ten dollar bills. Stinnett explained that the bank he went to only had ten dollar ($10.00) bills so he took them. Mauk advised that he has since been contacted by Stinnett, who wanted to purchase additional firearm receivers. Mauk told Stinnett he did not have the money to purchase any more receivers and Stinnett volunteered to finance the purchase. Mauk advised LRB Arms would only sell him fifty (50) receivers and no more.

On June 14, 2010, while monitoring the tracker, ATF agents

followed a Ford Explorer, a Saturn passenger car and a Chevrolet Impala from Dallas to Austin where the Impala and the Saturn traveled a different direction than the Explorer. Agents then followed the Explorer to the Residence Inn, located in San Antonio, where it stayed for one night.

On June 15, 2010, at approximately 10:30 a.m., agents observed the Saturn meet with the Explorer at a Valero gas station, and both vehicles left the area together. Both vehicles traveled approximately one hundred and fifty miles toward the United States/Mexico border. ATF coordinated with the Texas Department of Public Safety and both vehicles were stopped in the Eagle Pass, Texas area for moving traffic violations. The driver of the Ford Explorer was identified as Antonia N Lopez xxxx1965. This vehicle contained the Barrett .50 caliber rifle, with obliterated serial number and twelve assault rifles. The driver of the Saturn was identified as David Hance-Colon xxxx1986. This vehicle contained one handgun and thirty assault rifles. Numerous firearms in both vehicles contained obliterated serial numbers.

On June 24, 2010 SA Tim Holland talked to Frank REYES regarding a firearm he purchased from Richard STEVENS on May 11th or May 12th. The firearm is further described as:  One (1) Romarm/Cugir Model GP WASR 10/63, 7.62 caliber rifle bearing serial number DR-9611-10. REYES told SA Holland he traded the firearm to an unknown individual on May 22nd or 23rd at a gun show in Oklahoma City, Oklahoma. REYES stated that he traded it for a .22 caliber rifle

18

and he has seen a lot of people from Texas at the gun shows. The above listed firearm was one of fifty-nine guns recovered by the ATF San Antonio Field Office on May 20th that are believed to have been going to Mexico. On July 15, 2010 at approximately 11:00 a.m. hours, Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agents Justin Holbert and Raymond Parker went to Fred Baker's Outdoor America Gun shop located at 1925 N. MacArthur, Oklahoma City, Oklahoma 73127, telephone number 405-789-0051. The special agents met with store Customer Service Manager, Ms. Esta Schmidt, upon arrival and requested information concerning Kyle Wooten and Jeff Black.

The special agents asked Ms. Schmidt if they had any paperwork on purchases made by either Kyle Wooten or Jeff Black. Ms. Schmidt queried a computer and advised that they had records of prior purchases by Kyle Wooten on two separate occasions within the past six months and nothing from Jeff Black. The agents asked for copies of ATF 4473's receipts, or video tape of the purchases. Ms. Schmidt explained that any video tape of the purchases is no longer available as they only hold the video tape for two weeks post sale but she did provide ATF F 4473's and sales receipts of the transactions by Kyle Wooten.

Ms. Schmidt presented the following ATF form 4473's for Wooten. The first transaction occurred April 13, 2010, for four Century Arms WASR-10's 7.62 x 39 caliber rifles with the following serial numbers 1965IJ2615, 1967AL0679, 1965IJ2590 and 1975FL0277. This transaction price of $1855.34 was paid in

19

cash. The form also included sales receipts and a purchase Verification form. The second ATF Form 4473 for Wooten is dated April 20, 2010 for ten Century AK47, 7.62 x 39 caliber semi-automatic rifles bearing serial numbers 1981SAK0518, 1965IJ1548, 1983AH2632, 1972CB3184, 1986RE4882, 1975F02127, 1983AF3726, 19650P3256, 1983AG1148 & 19650P0068. The transaction was purchased with cash in the amount of $4638.34. The form also included sales receipts and a purchase Verification form.

On July 15, 2010 at approximately 11:30 hours Special Agents (SA) Justin Holbert and Raymond Parker went to Oklahoma Shooting Sports, Inc., H & H Gun Range located at 400 S. Vermont Suite 110, Oklahoma City, Oklahoma 73108-1034, telephone number 405-947-3888. The special agents met with store owner, Mr. Miles Hall, and his wife, Jayne Hall, upon arrival and requested information concerning Kyle Wooten and Jeff Black.

The special agents asked the Halls if they had any paperwork on purchases by either Kyle Wooten or Jeff Black. Ms. Hall queried a computer and advised that they had one previous purchase by Kyle Wooten dated March 18, 2010, but nothing for Black. The agents asked for any copies of ATF 4473's or receipts or video tape of the purchases. Ms. Jayne Hall provided a copy of the ATF 4473 for the purchase made on March 18, 2010 which was a Bushmaster BA50 50 caliber rifle bearing serial number BM00870. Ms. Hall also provided a sales receipt for

20

the rifle and 50 caliber rounds of ammunition for a total sales price of $5,467.48, all paid in cash.

On July 16, 2010, Special Agent (S/A) Justin Holbert and Task Force Officer Pablo Pinzon interviewed Stephanie Wooten. Stephanie Wooten is the widow of Kyle Wooten. She and Kyle previously lived at the "40 North" apartments in Stillwater, Oklahoma. The "40 North" apartments are situated next to a shopping center in which Kiko's Hookah Lounge is located. There is also a laundromat located in the shopping center. Stephanie said that Kyle had previously lost his job and was working odd jobs to pay the bills.

Early in 2010, Kyle was doing laundry at the laundromat, when he met a Hispanic male, whom he later introduced to Stephanie as "Frank." Frank is the owner of "Kiko's Hookah Lounge." S/A Holbert then showed Stephanie a picture of Frank REYES, and Stephanie confirmed that REYES was the Hispanic male that Kyle had met at the laundromat and whom also owned the Hookah lounge. Stephanie said that she met REYES on at least three occasions. On one occasion, after Stephanie and Kyle had moved to Perkins, Oklahoma, REYES helped Kyle remove a tree stump from their yard. Stephanie said that REYES drove a dark blue truck with chrome wheels. Kyle began working at REYES' Hookah bar doing electrical work and other jobs. Stephanie said that Kyle began to spend more and more time at the Hookah bar and would not come home until

21

very late at night. After a few weeks of working at the Hookah bar, REYES recruited Kyle to buy guns for him (REYES).

Stephanie said that she did not know exactly how many times Kyle bought guns for REYES, nor did she know the total number of guns Kyle bought for REYES. Stephanie said that she went with Kyle on one occasion to Oklahoma City to buy guns. Stephanie said that she and Kyle drove to a gun store that was right off the interstate in a shopping center. Stephanie said that she sat in the car while Kyle went inside to buy the gun. Stephanie said that Kyle returned with only one gun but it was a "great big" gun. It should be noted that S/A Holbert had previously confirmed that on March 18, 2010, Kyle Wooten purchased a .50 caliber rifle from H&H. Kyle and Stephanie then drove back home where Kyle dropped Stephanie off and took the gun to REYES at the Hookah bar.

Stephanie said that she did not know how much money REYES paid Kyle to purchase the guns because Kyle handled all the finances. Kyle continued buying guns for REYES over the span of a few months. Stephanie said that during this time, Kyle's demeanor changed, and their marriage began falling apart. Stephanie said that on April 22, 2010, Kyle went to Oklahoma City with his friend Philip Williamson to buy more guns for REYES. Stephanie said that Kyle did not return home until late that night and she was already in bed asleep. Stephanie said that when she woke up she found Kyle dead on their bathroom floor.

Stephanie said that the next day she took Kyle's cell phone and sent out a "mass" text message to all of the phone numbers that Kyle had stored. Stephanie said that the message was just to let Kyle's friends know that he had passed away. Stephanie said that within a few minutes, she received a text message back from a person listed in Kyle's phone as "Russell," saying that she (Stephanie) needed to pack up all of her belongings, and her children and get out of the house because she was in danger. Stephanie asked Russell what he meant, and he said that Kyle was dead because he (Kyle) didn't meet his quota for the month and owed money. S/A Holbert asked Stephanie what quota Russell was talking about, and she said that she thought it meant the number of guns that Kyle was required to buy for REYES. S/A Holbert asked Stephanie if she knew how many guns Kyle was required to buy, and she said no. Stephanie said that she did not know anything about Kyle owing anyone money. Based on the threats she received, Stephanie moved from Perkins with her children.

After Kyle's death, Stephanie kept his cell phone and used it for herself. Stephanie did not delete any of the contacts that Kyle had saved in his phone. Stephanie provided S/A Holbert all of the contact information for persons whom she did not recognize and that could possibly be involved with REYES. S/A Holbert gave the information to an ATF Oklahoma City Intelligence Research for further investigation. Included among the contacts was an entry for REYES with a phone number of 806-570-2581.

23

A short time after Kyle's death, Stephanie received a phone call on Kyle's phone from a man that she knew only as "Chapa." Stephanie said that "Chapa" worked at the Hookah bar, and is a Hispanic male, bald, skinny, and approximately 30 years old. "Chapa" was also one of the contacts in Kyle's phone that she had sent the text about Kyle's death. "Chapa" asked Stephanie where she was living, which she thought was suspicious because she had not told anyone that she had moved. "Chapa" also asked Stephanie if she planned on selling Kyle's tools. Because of the previous text from Russell, Stephanie became increasingly fearful and hung up the phone.

"Chapa" has called several times since, but she has not answered the phone. S/A Holbert asked Stephanie if she knew of any trips to Dallas that Kyle might have made. Stephanie said that she didn't know of any trips, and that it wouldn't surprise her if there were because Kyle was hardly ever home. S/A Holbert asked Stephanie if there would be anyone else that might know of Kyle's activities or who might be involved in the straw purchasing of guns for REYES. Stephanie said that Jeff Black was Kyle's best friend, and they (Kyle and Jeff) talked about everything. S/A Holbert asked Stephanie if there was anything that she could think of that might be important. Stephanie said that she could not think of anything, and the interview was concluded.

On July 21, 2010, Stephanie called S/A Holbert, and stated she received a phone call from Kyle's best friend, Jeff Black. Stephanie said that Black had not

contacted her since Kyle's funeral so she thought that it was strange for him to be

calling. Stephanie said that Black kept asking where she was living and if he

could come visit her and the children. Stephanie did not tell Black where she was

living because she felt like he was involved with REYES and "Chapa" and may

have been trying to get information for them.

On July 16, 2010, Special Agent (S/A) Justin Holbert and Task Force

Officer Pablo Pinzon interviewed Robin Lea Tyler. Tyler is the mother of Kyle

Wooten. Tyler stated Kyle told her that he was doing electrical work and other

jobs at a Hookah bar in Stillwater, OK. While working at the Hookah bar, Kyle

met a guy who recruited him to buy guns for him. Kyle said that he bought AK-

47s for the guy who in turn shipped the guns to Mexico. Kyle said that the guy

paid him one hundred dollars ($100) for every gun he bought. Tyler pleaded with

Kyle to quit buying the guns for the guy because it was illegal. Kyle told Tyler

that it wasn't illegal because he was filling out paperwork and there was a "paper

trail." Kyle never told Tyler the guy's name for whom he was buying the guns.

Tyler said that she continued to plead with Kyle to stop buying the guns,

but Kyle told her he had to make money to pay bills. Tyler said that she visited

Kyle at his home the weekend of April 4, 2010, which was Easter weekend.

During her visit, Kyle pulled her aside and told her that "she needed to understand

what he was doing in case something happened to him." She asked Kyle if he was

talking about buying guns, and he said yes. Kyle said that he wasn't sure if

25

buying the guns was legal as he once had thought and he may be in danger. Tyler and Kyle discussed him moving to get away from the Hookah bar and stop buying guns. Kyle agreed that he would stop. Tyler said that Kyle died April 22, 2010. Tyler said that Kyle had a neurological condition that could have caused his death but the timing and the conversations that she had with Kyle prior to his death made her suspicious. Tyler said that an autopsy had not been performed because of the pending toxicology reports. S/A Holbert asked Tyler if she knew of any trips to Dallas that Kyle might have made. Tyler said that she only knew of one trip, and Kyle took guns to Dallas on that occasion.

On July 14, 2010, SA Justin Holbert and Tim Holland met Philip Scott Williamson Jr. to speak with him regarding his purchase of firearms on April 22, 2010. When Williamson arrived, SA Holbert and Holland introduced themselves and asked Williamson to have a seat in the front seat of SA Holbert's vehicle. SA Holbert told Williamson that he wanted to talk to him about guns that he (Philip) purchased on April 22, 2010. Williamson was informed that he was not under arrest and was free to leave at anytime. Additionally, SA Holbert told Williamson he did not have to answer any questions. Williamson indicated he understood and agreed to talk to the agents. Philip Williamson stated Philip had a friend named Kyle Wooten whom he met when they worked together for the City of Stillwater. Philip said that Kyle died the same day that they had gone to Oklahoma City and bought guns. Kyle knew that Philip had lost his job and approached him one day

26

and asked if he (Philip) would be interested in making some extra money. Kyle

told Philip that all he had to do was go to Oklahoma City with him and buy some

guns. Philip agreed to go with Kyle to Oklahoma City and buy the guns. Philip

said that he didn't think that anything he did was illegal since he filled out all the

paperwork. SA Holbert told Philip that it was illegal to purchase firearms for

someone other than himself. Philip said that he and Kyle drove to downtown

Oklahoma City. Philip said that Kyle called and talked to the guy they were

supposed to meet in Oklahoma City several times along the way. When Philip

and Kyle got to Oklahoma City they went to a parking lot of a high rise apartment

building. SA Holbert asked Philip if he could remember the name of the

apartments and he said no, but the building was white in color and close to the

"bombing" memorial. S/A Holbert then retrieved a picture of Regency Towers on

his blackberry and showed it to Philip. Philip said that Regency Towers is the

building he and Kyle drove to in Oklahoma City. Once at Regency Towers, Philip

said that Kyle got out of the vehicle and met with an unknown Hispanic male who

was sitting in a utility van. The van was white with a ladder on top, and Philip

believed it said AT&T on the side. After meeting with the unknown Hispanic

male, Kyle got back into his car and gave Philip a bundle of cash wrapped with a

rubber band. Kyle then told Philip he wanted him (Philip) to buy eight (8) AK-47

rifles, and that there was more than enough cash there to cover it. Kyle then told

Philip he (Philip) would have to fill out paperwork and give the salesman his

27

(Philip) license. Kyle then said the salesman would check all of the rifles' serial numbers and make sure that they all functioned properly. Kyle told Philip that the whole process should only take about thirty minutes.

Philip said they then went to the gun store but he couldn't remember the name of the store. Philip said that he was extremely nervous but everything proceeded just as Kyle said that it would. Philip said that he spent about an hour inside the store till the sale was complete. The salesman carried the guns out to Kyle's vehicle for him (Philip). Philip said that the salesman seemed to recognize Kyle and Kyle's vehicle. Philip said once the guns were loaded into the vehicle they (Kyle and Philip) drove back to the same apartment building in downtown Oklahoma City where the unknown Hispanic male was waiting for them. Kyle once again got out of the vehicle and talked with the Hispanic male, and then they (Kyle and Hispanic male) loaded the guns into the utility van. After the guns were loaded in the utility van, Kyle got back into the car and they (Kyle and Philip) drove back to Stillwater. Kyle gave Philip $400.00 for buying the guns. Philip said that he (Philip) stayed inside Kyle's vehicle both times that Kyle met with the Hispanic male and never spoke to him. However; he did get a good look at him. Philip said that he could not remember the Hispanic male's name but Kyle's wife. SA Holbert then showed Philip a picture of Frank Reyes and Philip said that Reyes was the Hispanic male that he and Kyle met.

28

SA Holbert asked Philip who else knew that Kyle was buying guns and Philip said that Kyle's wife Stephanie knew and Kyle's best friend, Jeff Black, knew. SA Holbert asked Philip if he had talked to Stephanie since Kyle had died, and Philip said that Stephanie called a day or two after Kyle died to ask him if Kyle owed anybody money because she was receiving threatening phone calls. Philip told Stephanie that he didn't know anything about Kyle owing money or who would be threatening her.

SA Holbert asked Philip how Jeff Black knew Kyle was buying guns for other people, and he said that Jeff was supposed to go with Kyle instead of him (Philip) the day he (Philip) went with Kyle to buy the guns. Jeff couldn't make it, so Kyle asked him (Philip) to go. Philip said that Jeff lived in Stillwater.

SA Holbert asked Philip if there was anything else he could think of that the agents might need to know. Philip said that Kyle talked about a guy in Stillwater that had briefcases full of cash. Philip also knew that Kyle was doing electrical work on a Hookah bar in Stillwater and that is where he (Kyle) met the guys he was buying guns for.

On July 22, 2010, Polk made arrangements to sell REYES one ROMARM/CUGIR model SAR 2 rifle caliber 7.62x39 bearing serial number S11140499 and one ROMARM/CUGIR model SAR 2 rifle caliber 7.62x39 bearing serial number S20012799 at 1800 hours in the Bass Pro Shops parking lot. The Polk met with ATF Special Agents at a prearranged meet location prior to the

29

deal where he was provided with electronic surveillance equipment for the deal. The Polk was also provided the two above listed ATF firearms and ATF form 4473. At approximately 1750 hours, the Polk proceeded to the location to wait for Reyes.

At approximately 1819 hours Reyes arrived at the parking lot of the Bass Pro Shops where he met with the Polk. At approximately 1820 hours, the Polk placed the firearms in the backseat of REYES' blue Chevrolet Taho bearing Texas Tag 805 PLR. The Polk and REYES then entered the Tahoe to complete paper work for the transfer of firearms. Reyes paid the Polk $800.00 in U.S. Currency for the purchase of the two listed firearms.

ATF Agents conducted surveillance on REYES for the next three days until REYES arrived at the residence located at 1383 Honeysuckle Lane in Lewisville, Texas. REYES then took the firearms inside the residence. This is the same location the guns arrived at after the sale of the two firearms to REYES on June 8, 2010.

On July 25, 2010, Deputy Sonny Smith with the Denton County Sheriff's Office, State of Texas, initiated a traffic stop on REYES for speeding. During the search of the vehicle, Deputy Smith located a plastic bag between the 2nd and 3rd row seating that contained the smell of fresh marijuana. Deputy Smith went to ask REYES about the bag. Smith told REYES that he must be bringing some of his work home with him, and REYES stated "what did you find, a pipe?" Deputy

30

Smith believed the bag to be unexplained since this was not REYES' work vehicle but was instead his personal vehicle where paraphernalia should not be stored. Deputy Smith also located an unlocked black briefcase in the listed vehicle. Deputy Smith located two checks inside the briefcase for the amount of $27,700.00 and $6,000.00, both written on AK Sports account. Also contained inside the briefcase were three 5x7 white sheets of a spiral notebook containing an itemized list of currency amounts with either a gun manufacturer or gun model listed next to the currency amount and on some lines a name would be present next to the manufacturer or model name. Three sheets contained fifteen to twenty lines of information per page and were dated 6/27/10, and the subtotal of the currency was $43,407.00. Deputy Smith also found two pistols in the vehicle that he checked to determine if they were stolen with negative results.

Deputy Spears, who was also at the scene, told Deputy Smith during a conversation after the traffic stop that REYES told him that he traded in firearm and his partner had a safe full of them. REYES told Deputy Spears that the Smith & Wesson pistol, which was one of the firearms discovered by Deputy Smith, had been given to him.

During this investigation, it has been determined that Francisco Javier REYES (H/M XX/XX/1981) is issued Oklahoma Drivers License Number L082037048, which expires June 30, 2014. REYES is described as height 5'8",

31

164 lbs., brown hair and hazel eyes. REYES lists his place of residence as 333

NW 5th, Oklahoma City, OK 73102, on his Oklahoma Driver's License.

It has been determined during this investigation that the 2007 Chevrolet

Tahoe, which REYES drives as his personal automobile, which bears Texas

License Plate Number 805PLR and Vehicle Identification Number

1GNFC13J37R150936, is registered to Gabriel Reyes, P.O. Box 174, Booker,

Texas 79005, in the Texas Department of Transportation.

It has been determined by the United States Postal Inspector Service that

Francisco Javier REYES' residence is located at 333 NW 5th Street, Apartment

612, Oklahoma City, Oklahoma 73102, which is located at the Regency Tower.

Throughout the ATF criminal investigation of Francisco Javier REYES, he

has maintained his residence at 333 NW 5th Street, Apartment 612, Oklahoma

City, Oklahoma 73102 and has mainly operated the 2007 Chevrolet Tahoe, Texas

License Plate Number 805PLR and Vehicle Identification Number

1GNFC13J37R150936 as his personal vehicle.

Based on this information, there is probable cause to believe that Francisco

Javier REYES has committed several violations of Title 18 U.S.C. Section

922(a)(5) transferring, selling, trading, giving, transporting or delivering firearms

to any person who he knows does not reside in Oklahoma, Section 922(a)(6) and

2(b), caused the making false or fictitious statements, oral or written intended or

likely to deceive a firearms dealer, and Section 924(a)(1)(A) and 2(b), caused the

32

making false statements or representations with respect to the information required
to be kept in the records of a person licensed to sell firearms.

**FURTHER AFFIANT SAITH NOT.**

Michael D. Randall
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Subscribed and sworn to me before this ⁹ᵗʰ day of August, 2010.

UNITED STATES MAGISTRATE JUDGE

33